Proceed to the next case, Calhoun Skilled Care v. The Workers' Compensation Commission, 4090901. Counsel, please. May it please the Court, Mr. Beaman. My name is David Davis. I represent Calhoun Skilled Care in this matter. This is a review of a 19B proceeding. At trial, the arbitrator determined that the claimant failed to prove accident or causation. The matter was appealed to the commission, which in a two-to-one decision reversed the arbitrator. The Circuit Court of Green County then confirmed the commission's decision, and that brings us here. Standards of review are probably manifestly to the evidence, although there might be a question of law with respect to the turning of the head. Briefly, the facts in this case are that we're dealing with a 56-year-old LPN who on October 9, 2004, was working in the dining room. The resident was ready to leave the dining room and was in a wheelchair. Ms. Gibson pushed the wheelchair about four feet one way and about four feet the other, and then went back to another dining room table. And as she started to turn and walk, she said, I felt either an explosion in my neck, an electric shock, my left side got numb, I got nauseated, I stooped down, I couldn't go on. Her husband was called, and this is what, at trial, Ms. Gibson said is the work accident, which makes sense. She began seeking treatment at that point in time. This particular history of turning to her left while walking is the same one she gave five times over the next week, four times to four different doctors, and once in her own accident report. Her accident report says, pushed resident forward in wheelchair, turned to left, and felt instant, rushing, pinpricks, sensation all over body. There's no history of a repetitive trauma at this point, no history that she had been experiencing some neck soreness prior to this turning of her head, although she does add that later, as you know. At trial, it was not really clear what theory the client was pursuing under. Are we single trauma, October 9, are we repetitive trauma? So the arbitrator addressed both, said, number one, it looks to him like this mechanism of injury was turning the head to the left when increased risk doesn't arise out of, not an accident. Arbitrator then said, if this is a repetitive trauma claim, still don't win because there was no medical opinion providing the connection between her alleged repetitive activities and her injuries. So the question becomes, on review to the commission, again, what's the theory here? And we continue to believe that it's a single trauma. This lady had an event on October 9th, which she said was an explosion in my neck. I was turning my head and walking. I was not carrying anything. I wasn't pushing anything. I was just doing what I'm going to do right now to go back to my counsel table. We all do that move many times during the day. It does not increase the risk of injury. And I think the case law that I cited in my brief is consistent with that. The commission didn't specifically address that theory. Instead, the commission appears to be saying that we're treating this as a repetitive trauma claim. And I should say the commission majority because, as you know, there was a dissent. And let's look at the majority's rationale for finding this claim compensable because I think it's very important. They first point out that the claimant testified, and there is some indication in the record that she had neck soreness from working in the days prior to this turning her head. And there's no doubt about that. That is in the record. The commission then states the following, quote, this pre-existing condition, I guess the neck soreness, combined with the physical requirements of her job led to a situation where she was susceptible to sustaining a cervical strain after pushing the resident in a wheelchair. That's not a factual finding. That's a medical opinion. That's a medical conclusion. Her soreness led to a situation where she was susceptible to sustaining a cervical strain by turning her head. Well, if we look at it in that isolated framework, wasn't there some evidence somewhere here in the record that she had a history of osteoarthritis? Yes, there is. And so she's in the process of pushing, I mean, she was performing work of their duties and pushing the resident, correct, in a wheelchair? Yes, sir. She wasn't off on some side, you know, irrelevant personal mission. So you have the history of osteoarthritis. You have her doing her work, pushing the patient in a wheelchair. She then turns and has this pain. If it's an aggravation of a pre-existing condition, why would that not be compensable? If there's evidence that that's what the diagnosis was, but she was diagnosed with a strain, not with aggravation of a pre-existing condition. She was initially diagnosed with a left shoulder strain. But when she first began treating, again, four different doctors in the first week after this incident, left shoulder strain, neck strain. And the commission's finding is that she sustained a cervical strain. She was susceptible to sustaining a cervical strain. Where did they get that from? There was no, as you know, there's no deposition testimony in this case at all. Was there something in Dr. Harmon's records that indicated there was a pre-existing condition? Not Dr. Harmon's. In the Wayne County Hospital, the first place she went to, they just said past medical history of osteoarthritis. At trial, she said, yes, I had neck stiffness and soreness before, but I never saw treatment for it. So even if you have, and we all have arthritic, if we get older, this lady's 56, you still have to prove you've got a work-related event. Turning and developing pain, whether it's because you popped a disc at that moment, whether it's because you're aggravating something, that's not an accident. That doesn't arise out of it. That could have happened to her at home when she was coming to work that morning and turned to her left. Well, was she simply walking down the hallway at the facility and turned when she allegedly sustained the strain, or had she just gotten done pushing a patient in a wheelchair and then turned? Yes, she was pushing the resident, then she lets go, then goes to turn. It's the same move that you would make at home when you're looking to see what time it is on the clock. I mean, we do this constantly. We're looking to the left, to the right. Well, I understand that, but you know, normally the general public isn't always pushing somebody in a wheelchair during the course of a day. Absolutely, and if this injury occurred while she was pushing in the wheelchair, then I think it may be a different case. But there was no pain while she was pushing the wheelchair. So you're saying the pain has to strike at the very moment you're pushing the wheelchair. If Claim is going to try to relate, and she never made an attempt to relate, pushing this wheelchair with her neck. If you're carrying some heavy ladder across your yard and you're struggling to do that, then you put the ladder up, and then as you turn, for the first time you feel the pain, you'd legitimately argue that what you had just done before, the moment before, had nothing to do with the strain? I think you could, but in this case there's no evidence that she was straining her neck. Again, this is a wheelchair. The patient was light. She was not straining to move the wheelchair. She wasn't putting the person in the wheelchair. This is just, you know, you move the wheelchair three feet, that's it, three feet, just from here to here. Three feet one way, three feet the other way. And I've said, oh, I've always struggled and was, you know. So you're saying, in essence, as a matter of law, the injury did not arise out of the employment? Absolutely. Again, what's the theory? Single trauma or repetitive trauma? If the theory here is single trauma, then it has to be when I was turning my head to the left on October 9th and felt this explosion, this shock in my neck, down to my toes. And that's no different than the other cases I cited in my brief, where you're swiveling in your chair, you're taking your coat off, and you develop an onset of pain. That by itself doesn't arise out of it. And I think the commission ducked that issue. They didn't want to go there, as it were, because I think that's a tough one to get over. Well, I don't think they ducked it. I think they said that the lifting and the transferring of the patient, patients approximately a week before made her susceptible to a strain, put her in a weakened condition, let's put it that way. When she does even normal activity, turning. Now, if that's the case, it's compensable. If there's medical evidence to support that, I agree with you. Well, you've got evidence of good health up to early October. She testified she was having no difficulty with her back prior to the events of early October. And the only thing that happens is, according to her, she strains herself or develops some pain in her back. Lifting and transferring patients while she's working, she pushes a resident several days later in a wheelchair, turns, and she has this pain in her back. It causes her to fall to the ground. If there's medical evidence that supports this commission, as you all know, the commission's findings must be based on the record. There is no medical opinion record that says that this lady's soreness, and that's all she complained about after doing the lifting and the days before this. I had neck pain, soreness. Never diagnosed, never treated. And no doctor came along and said, well, you know, because you can have your, say your example, judge, you're carrying the ladder and you may get sore, and then the next day, you know, you turn your neck and maybe you pop the disc. Two completely different issues. One was soreness, one's a disc injury. So why, you know, what is it about having soreness now makes you increase susceptibility to having a neck strain? You know, I've been doing this for 30 years. That's a new, and I don't know of any, and again, if it was medical, if some doctor would say, oh, yeah, that's what I think happened here. But there is no doctor saying that, none. So then I think the commission says, well, this is a repetitive trauma claim, and that's how we're going to deal with this. And, you know, they go on to say that although she was not pushing the wheelchair at the time of her initial onset of acute symptoms, she had just finished pushing the resident and had straightened up and turned in order to return to her duties of assisting the other residents in the dining room. This is not a case where any activity would have caused petitioner's injuries. Says who? No doctor said that. This is another medical opinion by the commission. They are making this stuff up, that she's susceptible to a cervical strain, that turning her head couldn't occur, that her injuries couldn't occur, where this is not a case where any activity would have just caused her petitioner's injuries. Where in the evidence, where in the record is there anything that supports that? It's not there. To prove repetitive trauma theory, we'll go back to Justice McCullough's case in which he was a member back in 88, 87, the Nunn case. And the Nunn says that, look, if you're going to allege repetitive trauma, here's how you go about proving it. You need testimony. Okay? Generally, repetitive trauma generally relies on medical testimony to establish causation between the work performed and the claimant's disability. Nunn says cases involving aggravation of preexisting condition, primarily concern medical questions, not legal ones, especially to a repetitive trauma. And then here's the clincher. In a repetitive trauma case, there must be a showing that, one, the injuries were related, and two, not the result of the normal aging generative process. And in Nunn, you had somebody with back pain. They did a lot of lifting and working and didn't have any medical evidence saying the repetitive duties were causative. She lost. Here, same thing. This lady had an MRI shortly after the accident that shows significant degenerative changes in C5-6. She's got stenosis. She's got spurs. The history of osteoporosis, which she tried to deny at trial. But there's no testimony that her injury is work-related and not the result of a normal aging process. The commission tries to gloss over this and say, Well, Dr. Harmon said it's work-related. Well, where do we get that commission? And they don't tell you where, but as I say in my brief, there's only one place they could have said that. The claimant's attorney sent Dr. Harmon a letter. And I've got some questions for you. The letter came back, apparently, to the claimant's attorney with some handwritten answers in the side. Question three says, Based upon a reasonable degree of medical certainty, do you have an opinion as to whether her current condition This is May of 2005. Whether her current condition is related to the injury she received at work on or about October 9, 2004. That's the date she turned her head and felt this explosion in her neck. And there's handwritten notes in there. And the commission, apparently, interpreted the notes, concluded that Dr. Harmon signed them. They're not dated or initialed or signed or anything. And let's assume that the commission was within its prerogative to say, well, I'm going to determine that that is Harmon and that he says that, yes, her current condition is related to the 10-904 injury. How did they get the record? Was that part of the doctor's records? Yes. And I put it in as well. Go ahead. No hypothetical question was set forth in this letter. Doctor, I want you to assume that this lady was working for a couple, three days. She developed neck soreness. She did this. Is this the sort of thing that could be causing her condition? And is her current condition the result of the normal degenerative aging process? Counsel, your time is up. Not in there. Counsel, please. May it please the court. My name is Brent Beeman with the law firm of Walter Beeman & Lynch in Springfield, Illinois. And I represent Rosa Gibson in this matter. The issues before the court are accident, causal connection, there's an issue with the patient's condition, there's an issue regarding the commissions giving my client 45 and five-seventh weeks of temporary total disability, and whether she is entitled to medical benefits after a certain date. The commission granted or sided with Ms. Gibson on each one of these issues. Mr. Davis made mention of the arbitrator's decision and the fact that there was a dissent with the commission's decision. The fact of the matter is the commission sided with Ms. Gibson on each issue. In addition, the Green County Circuit Court affirmed the decision of the Illinois Workers' Compensation Commission. In regards to the accident issue, the court sided evidence for its determination that Ms. Gibson's injuries were caused by work. First, the commission mentions that the physical requirements of Ms. Gibson's job led to being susceptible to the cervical strain after pushing the resident in the wheelchair on October 9, 2004. Where is the evidence of that linkage? The medical evidence of that linkage is found in the vast majority of Ms. Gibson's medical reports which were given as exhibits in this case. She mentions that the week before, and this is an important matter, the week before, October 4th, 5th, and 6th, she was lifting patients which ranged from 90 to 180 pounds. We know that. We know that. Okay, let's cut right to the, it seems the linchpin of his argument is, we know that, but how does that result in her apparently turning her head in a normal manner, causing this injury? How does that relate? How does that all relate? Where's the medical on that? He's saying the commission apparently put on their white coat and stethoscopes and came up with that expert medical opinion. Well, Your Honor, there was a causal connection opinion given in this case which we spoke about, which was the letter that a respondent, in fact, introduced as part of his evidence, which says that she sustained an injury. This is the Dr. Harmon letter? Yes, Dr. Harmon. Where did that letter come from? That was a letter sent to Dr. Harmon. No, no, where did we get the letter that had the notations on it? Was that contained in Harmon's records? That was in Harmon's records, and it was also in respondent's exhibit. And what testimony was there as to who wrote the note? None. Was any question ever asked of anyone who wrote that note? How do we know that's Harmon's handprint? Dr. Harmon was not called in the trial, so that is the causal connection opinion, which respondent had a Section 12 doctor who the commission could have sided with, but the commission chose that Dr. Harmon's records and note was more credible than the respondent's Section 12 doctor. Would the respondent's Section 12 doctor agree that was supported your case? What did they say? The Section 12 doctor? I don't believe that he said anything that was too supportive of my case. But you said they could have sided with, or you mean sided and gone against you. Yes, sided and gone against my client with the help, excuse me. They could have decided with the Section 12 doctor, but as it is their job, they weighed the evidence. And they determined that Dr. Harmon's records, including the note, was more credible than respondent's Section 12 doctor. Counsel, it might be helpful to know the theory of recovery here. Were you proceeding on a single trauma, repetitive trauma, aggravation of a preexisting injury? What was the theory of recovery? Well, I was not the trial counsel on this case, although I believe that it is repetitive injury. It's not a classic repetitive injury like a secretary who types for 15 years and develops carpal tunnel syndrome. Apparently the neck pain started October 4th, 5th, and 6th of the previous week. Ms. Gibson had off the 7th and 8th and came back to work on the 9th and was continuing to lift and move patients right up until just before she felt the neck injury. So just as I'm being a simpleton here, but lifting patients, usually there's a different type of injury you get from lifting patients, isn't there other than neck pain? Well, there could be, but lifting patients wasn't the only thing that she was doing. She was also pushing patients in a wheelchair. So if I were to look here and find something that connects this, what is her injury she's complaining of, cervical spine? Yes, cervical radiculopathy. And what doctor says that that injury, those symptoms, etc., stemmed from what she was doing? Dr. Harmon. We're back to Dr. Harmon again. Yes. And all we have is a letter you sent with some notations, which we don't know who wrote it, right? Yes. That's all we've got. Well, we can presume that Dr. Harmon wrote it. It was in his records. In addition, it was in his records. I don't know how they would have come into his records unless he wrote it. I take it the letter was addressed to Dr. Harmon. Yes, the letter is addressed to Dr. Harmon. Dr. Harmon, we want you to answer these questions. Yes. And then there are handwritten answers in his medical records. Yes, there are. So if we didn't get that, not all of us have that, what actually did he say? He stated that ‑‑thanks, Mr. Davis. Okay, here are his opinions. This is a letter addressed to Dr. Harmon from the law office of Norbit J. Gotten, I believe, in Jerseyville. I have the following questions. Did you remove Ms. Gibson from an eight‑hour work shift and light duty at any time between January 1, 2005 and March 24, 2005? The answer is no. Based upon a reasonable degree of medical certainty, did you have an opinion as to whether or not she can pursue her duties as an LPN at the nursing home? She can, but less than 12 hours. Based upon a reasonable degree of medical certainty, do you have an opinion as to whether her current condition is related to the October 9, 2004? I believe that her condition is related to her injury on October 9, 2004. So does he record a history of cumulative lifting being the cause of the petitioner's obeying? He doesn't, does he? No, he does not. But there is a litany of medical evidence in the records which support a repetitive injury. Let me ask you this. Can a finding of causal connection in a cumulative trauma case be premised upon a causation opinion based on a specific trauma theory? Well, that would be presuming that this is a single, that his opinion in this letter of May 4, 2005 is a single accident date opinion. Is there anything in there that indicates anything other than that? His opinion is premised upon anything other than that? No. I have a couple of questions on this TTD problem. Yes. The commission contends that she was taken off of work by Dr. Harmon during the initial period of October 10 through November 28, 2004. She never saw Dr. Harmon until October 18. When was the first time she ever saw him? I believe November, you said November. I said the commission found that she was entitled to temporary total disability for the periods of October 10, 2004 through November 28, 2004, March 25, 2005 through December 30, 2005, and then says during this initial period the petitioner was taken off of work by Dr. Harmon. That's an inaccurate statement. She never saw Dr. Harmon until October 18. He couldn't possibly have taken her off of work on October 10. Second of all, how did you get temporary total disability for October 11 when she worked on October 11? She went to work and worked a full shift on October 11, yet Commissioners Pickett and DeLuno decided to give you TTD benefits for a day she worked. How does that happen? Well, if she was working that day, then she wouldn't be entitled to temporary total disability. Why did she not work on October 10? She went to the emergency room after the injury on October 9. So I would presume that it was due to the injury. Well, we'd have to presume it because there's absolutely no testimony in the record at all as to why she didn't go to work on October 10. She never testified as to what her condition was on the 10th. And we know she worked a full day on October 11. She did testify as to why she didn't go to work on October 12. She said she was feeling really, really bad, miserable and hurting, and that she went for treatment to the chiropractic clinic from the 12th to the 15th. Well, Your Honor, in regards to the temporary total disability issue, I believe that if there's evidence in the record that she was working, she shouldn't be given TTD for that time period if she was working. But the determination of the Commission cited evidence for why it granted temporary total disability. It cited off-work slips. And I believe that that stands up under the manifest way to the evidence standard. You're probably right for the periods other than October 10th and 11th. So from October 12th through November 28th, 2004, she was off work. That's an evidence. And the Commission granted her temporary total disability. She was also off work after she was either fired or had a reasonable understanding that she was fired from March 25, 2005 to December 30, 2005, which was the date of the arbitration. So I believe that the presence of the off-work slips is enough to sustain their determination of temporary total disability with the manifest way to the evidence standard. Let me touch briefly on the medical benefits. Dr. McGregor, a treating physician, didn't think much of her complaints, did she? She had some problems with, I believe, the functional capacity exam. However, the Commission saw that evidence. And it determined that she was entitled to temporary total disability and that she was injured. They didn't determine that any possible problems she had with the functional capacity exam were enough to deny her benefits. You're right about the TTD, Judge. If this is a compensable claim, I didn't find an off-work slip until I think it was 10-26-04. In the second period of the TTD, the Commission said she had lengthy restrictions. Eight hours a day is not a lengthy restriction. That's the only medical restriction she had. But whether she was fired or not fired or whatever her understanding was, the fact of the matter is that at the beginning of March 25, when she stopped working, she was under no restriction other than don't work more than eight hours. Well, okay. That doesn't preclude her from working. There's testimony from the home that had she wanted to work, she could have worked eight hours. That's not a problem. So we don't believe it was appropriate for the second stint of the period of time up until maybe December 19 when Dr. Harmon did take her off of work. That's a question about whether or not that's sufficient and that gets to a very manifest way. There is some evidence with the off-work slip certainly for that question whether it's enough. I want to get back to the crux of the matter, and that is the accident causation issue here. When you're going to have a case like this, let's keep a couple things in mind. What is this lady's injury? She's got a history of osteoarthritis. She's talking about some soreness of her neck and shoulders before anything ever happens at the nursing home. After she has this turning-of-the-head incident, left shoulder strain, neck strain, Dr. Trudeau eventually said that he thinks, and I've not heard, that she might have been suffering from LHERMITTES phenomenon with the syndrome. She had a CT of the brain within the first week or so of the accident because of her symptoms of this whole left side, this numbness. What injury are we dealing with here? She ends up with a radiculopathy by an EMG, mild, and Dr. McGregor is suspicious of it. Well, turning the head when you've got a shoulder strain, how does that become a discogenic problem or a nerve root irritation problem, which, as we all know, is what a radiculopathy is? That diagnosis didn't come into the fore until, what, from October until March, six, seven months later. I don't know. This case needed an expert to sort everything out. You've got different possible theories here. You've got a bunch of different conditions. You've got a lady who's 56 with an MRI showing degenerative changes. What's related to what? This isn't the kind of case, and I haven't found any in the appellate court, where you can conclude that, yeah, this is common knowledge of laypersons, what this Dr. Trudeau's diagnosis is, what radiculopathies are, what causes them, what kind of injuries you can get from turning your head, whether that's the same kind of injury you can get from lifting or transferring. This is way beyond an average layperson's ability. So an expert opinion was needed here, and none is controlling. None says if you're going to rely on repetitive trauma, and that's what she's relying on, then there not only needs to be evidence that it's work-related, but it's not the result of the normal degenerative aging process. Where is that opinion anywhere in the record? It's not there. Harman's letter, if you accept it, is being a causation opinion. He does not, in that letter, state, and her current condition is not the result of the normal aging process. You can't prove a case with this, and that's with none. Justice McCullough, you reminded the petitioner back then, just don't do it that way. And so, well, okay, I turned my neck, that's how I'll do it. I'll go back to my single trauma. No, that's not arising out of it. So I really think it's important to keep the eye on the ball here, and that is if you're going to be having a claim like this for multiple diagnoses, multiple potential mechanisms of injury, you need an expert to sit down and say, here's my opinion. And a none case says it's supposed to be testimony, not an unverified, undated, unsigned, uninitialed, handwritten note to a single trauma question. And you're exactly right, Judge Hudson. You can't use a single trauma opinion to justify repetitive trauma. And if we look at Harman's records, and I know you guys already know this, but there's only one reference to his mechanism of injury, and that's October 18th, the first time he saw her. And Dr. Harman at that time, his history was that she was pushing the wheelchair when she developed pain. No mention of a repetitive trauma, like I say, her accident histories early on are all turning my head. There's none of this, I was sore, and my soreness increased to the point where turning my head somehow causes this thing to become a problem. But Dr. Harman's initial office note doesn't help. That history is, pushing patient to dining room 10904 and felt explosion in neck. That's the only history of any kind of work-related injury. Dr. Harman, thank you. Of course, we'll take the matter under the driver's disposition.